FILED

UNITED STATES DISTRICT COURT 2015 JUN -9 PM 2: 31
MIDDLE DISTRICT OF FLORIDA

US DISTRICT COURT

CASE NO.: 6:15-cv-936-0A-40DAB

JACQEULYN JOHNSTON,

        Plaintiff,

v.

GARY S. BORDERS, individually and
in his official capacity as the Sheriff
of Lake County, Florida, and JENNIFER
FERGUSON,

        Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiff, Jacquelyn Johnston ("Johnston" or "Plaintiff"), by and through her undersigned counsel, sues Defendants, Gary S. Borders, individually and in his official capacity as the Sheriff of Lake County, Florida ("Borders"), and Jennifer Ferguson ("Ferguson") (collectively "Defendants") and in support thereof states the following:

### NATURE OF THE CLAIMS, JURISDICTION, AND VENUE

    1.    This is an action for monetary damages pursuant to 42 U.S.C. §1983 (hereinafter "1983"); 42 U.S.C. §1985, 42 U.S.C. §1986, common law Defamation by Implication; Defamation (libel and slander); and Defamation *per se* (libel *per se* and slander *per se*).

    2.    Plaintiff invokes the federal question and civil rights jurisdiction of this Court pursuant to 28 U.S.C. §§1331 and 1343(a)(3) and (4). Plaintiff also invokes this Court's supplemental jurisdiction over her state law claims that arise from the same nucleus of operative facts as the federal claims alleged herein pursuant to 28 U.S.C. §1367(a).

3.      Venue for this action lies in the Middle District of Florida pursuant to 28 U.S.C.

§1391(b) and the actions upon which the matter are based took place in Lake County, Florida.

## PROCEDURAL BACKGROUND

4.      Plaintiff has complied with all conditions precedent to filing this action by

sending certified return receipt notice of intent to sue in tort to Borders and the Department of

Financial Services pursuant to Florida's Waiver of Sovereign Immunity law, Fla. Stat. §768.28,

a copy of which is attached hereto as COMPOSITE EXHIBIT "A" and made a part hereof

along with the return receipts ("Notice").

5.      Borders has not made a final disposition of Plaintiff's claim within six (6)

months of the date he was provided with the attached Notice.

6.      Accordingly, Plaintiff's claims are deemed denied for the purposes of the notice

requirements imposed by Fla. Stat. §768.28.

## PARTIES

7.      Johnston was, and still is, a resident of Miami-Dade County, Florida at all times

pertinent hereto, is over the age of eighteen (18) and otherwise *sui juris*.

8.      Borders is the elected Sheriff of Lake County, Florida whose office is located

at 360 W. Ruby Street, Tavares, Florida  32778.

9.      Ferguson works as the current supervisor of Lake County Sheriff's Office

Animal Services ("LCSOAS") and is a resident of Seminole County.

10.     At all times pertinent hereto, Defendants are both over the age of eighteen (18)

and otherwise *sui juris*.

11.     At all times pertinent hereto, LCSOAS was under the control of Borders.

2

## GENERAL FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

12.     On October 1, 2014, after being hired by Borders, Johnston commenced her position as the Director of LCSOAS.

13.     On October 10, 2014, just nine (9) days after Johnston took over as the Director of LCSOAS, Borders terminated Johnston.

14.     Within minutes of the termination, at the direction of Borders, Lake County Sheriff's Office ("LCSO") released a statement surrounding the termination of Johnston's employment as the Director of LCSOAS.

15.     Borders announced Johnston was terminated after LCSO learned that on October 9, 2014, several animals at the shelter were euthanized despite an alleged policy wherein euthanizing animals was only to be a last resort.

16.     Borders is quoted as saying: "This decision was made on our watch and we have taken swift action to ensure it does not happen again." ("Borders First Statement")

17.     On October 11, 2014, upon information and belief at the authorization and behest of Borders, LCSO released the following account of the events surrounding the termination via it's spokesman, Sgt. Jim Vachon:

> Our administration was notified by a volunteer at Animal Services that up to 20 animals had been euthanized. Law enforcement, especially, has a healthy respect for animals and what they can contribute, so it's a tough thing to hear. A certain number of them were sick or injured which would be in our policy. But certainly not all of them.

("Borders Second Statement")

18.     On October 13, 2014, upon information and belief at the authorization and behest of Borders, Lt. John Herrell disseminated the following information to the media surrounding the termination of Johnston:

> Johnston was terminated after LCSO learned that 147 animals were euthanized during her time as the Director of LCSOAS, including two (2) cats and eighteen (18) dogs in one day. All but six of those animals were put down for legitimate reason including, but not limited to, aggression, sickness and injuries. Some of the animals were put down prematurely because the shelter was not yet at capacity even though Johnston gave the reason for euthanizing the animals as limited space. Johnston did not exhaust all the resources to save the animals and exercised bad judgment. Borders wants the shelter to be as close to a no-kill shelter as possible. Because the killings happened on Johnston's watch, it was her responsibility.    Johnston made a bad call and euthanized some dogs that could have made good pets for people. That's why we took the action we did, to make sure something like this doesn't happen again.

("Borders Third Statement")

19.     Even if the numbers released by LCSO are accurate, these numbers were released without being put into perspective.

20.     The numbers may sound shocking to the general public, but there is no way to know, based on the information released by LCSO, how those numbers compare to the periods of time before Johnston arrived or after Johnston was terminated.

21.     These press releases were intended to destroy Johnston's reputation and to bolster the reputation of Borders in his takeover of LCSOAS.

22.     Following the release of the aforementioned press releases, news syndicates from all over Florida, Pittsburgh, Atlanta, New York, and as far away as London, picked up this story and published the numbers and circumstances surrounding the termination of Johnston's employment along with her photograph.

4

23.     The Examiner, a national internet publication, also picked up the story.

24.     Immediately following, comments and death threats were posted all over the internet regarding Johnston, including, but not limited to: calling for her euthanasia, removal of any children or animals in her care, lighting her on fire, sodomizing her to death, murdering her, criminally prosecuting her for animal cruelty, etc.

25.     Johnston received comments and death threats on her own social media page on Facebook.

26.     Borders' publishing false statements and statistics without a point of reference and with the intent to cause harm, irreparably ruined Johnston's career and endangered her and her family.

27.     Johnston cannot find a job ANYWHERE, let alone in the animal services field, despite her qualifications, training, and experience because of the selective information released surrounding the termination of her employment.

28.     Despite her attempts to switch career fields, Johnston is still unable to make a sufficient living to support herself and her family.

### The Events of October 9, 2014 that Led to the Termination

29.     Ferguson, the Kennel Supervisor, approached Johnston on the morning of October 9, 2014, a few hours before Johnston left to attend her Master's Class in Miami, Florida.

30.     At all times pertinent thereto, Johnston instructed Ferguson to follow policy as it existed prior to her arrival, as long as it was in accordance with Florida law, especially the pre-existing policy of LCSOAS regarding making space for new intake animals.

5

31.     There were various witnesses to Johnston's specific instructions to Ferguson to follow policy, including, but not limited to, Amber Teeter ("Teeter") and Diane Hagan ("Hagan").

32.     Captain Todd Luce ("Luce"), one of Johnston's supervisors, instructed Johnston to ask Ferguson about current LCSOAS policy until Johnston was up to speed, as the shelter had been without a real director since March 2014.

33.     Ferguson lied to Johnston about the pre-existing LCSOAS policy, that had been in effect prior to Johnston's arrival, for making space for new intake animals for her own personal gain.

34.     Johnston **NEVER** authorized Ferguson to do anything other than follow the pre-existing LCSOAS policy for making space for new intake animals and to record outcomes truthfully and accurately.

35.     Johnston specifically asked Ferguson if all rescues, volunteers, and fosters had been contacted before any animals were considered for euthanasia, to which Ferguson said she had contacted all rescues, volunteers, and fosters and that all fosters were full.

36.     Johnston then directed Ferguson to post a public call for more volunteers and foster homes on the Lake County Sheriff's Animal Services Facebook page.

37.     Johnston asked Ferguson, again, what the policy was when space is needed and Ferguson replied that space is made by euthanizing dogs from the isolation area that had not yet been posted as adoptable or made available for public viewing.

6

38.     Johnston asked Ferguson how many of the dogs from the isolation area had never been seen by the public and had behavioral issues to which Ferguson replied only one (1).

39.     Johnston was particularly concerned since many of the dogs on the adoption floor had been in their cages for over six (6) weeks, and the dogs in the isolation building had only been in the shelter for five (5) days.

40.     Johnston instructed Ferguson to first only euthanize dogs that were aggressive if space was needed per the pre-existing LCSOAS policy prior to the arrival of Johnston.

41.     Ferguson advised Johnston that more space was needed because dogs were being held in outdoor kennels without shade due to lack of indoor kennels.

42.     Based on the circumstances as conveyed to Johnston, Johnston agreed that under those specific, dangerously hot conditions, space needed to be created for the new intake animals.

43.     Johnston once again instructed Ferguson to follow the pre-existing LCSOAS policy, that had been in effect prior to Johnston's arrival, for making space for new intake animals and that Johnston would actively work to take action so that this situation would not arise again in the future.

44.     Johnston advised Ferguson in the form of a reprimand that in Ferguson's capacity as kennel supervisor, Ferguson's job was to manage the flow of animals and make the appropriate accommodations utilizing shelter resources so that a "space crisis" could be avoided at all times, including, but not limited to, **constantly** reaching out to rescues, fosters,

and volunteers for their assistance, as opposed to **only** reaching out when a "space crisis" had already occurred.

45.    This conversation between Johnston and Ferguson was overheard by at least two (2) individuals, Teeter and Hagan, who can corroborate that Johnston demanded Ferguson on several occasions to follow the policies that were put in place prior to Johnston's arrival for the time being.

46.    Ferguson asked Johnston how Ferguson should outcome the euthanized animals in the computer system to which Johnston indicated that the outcomes should be recorded truthfully because Johnston was acutely aware that it is a misdemeanor and in violation of Florida Statutes §§823.15 and 839.13 to falsify county records.

47.    After Johnston left LCSOAS for the day to go to Miami to attend class, Ferguson went completely rogue, defied Johnston's instructions, pulled far more animals than necessary, and euthanized more animals than needed.

48.    Upon information and belief, Ferguson physically held each of the dogs during the euthanasia procedure.

49.    Ferguson informed Johnston space was needed for approximately eight (8) dogs, but Ferguson pulled one hundred twenty five percent (125%) more dogs than necessary and euthanized all of them.

50.    Ferguson reported to Johnston that in total, from isolation and the adoption floor, five to six (5-6) of the dogs euthanized were aggressive dogs.

8

51.     To be clear, Johnston's instructions to Ferguson were to pull the aggressive dogs first and outcome them truthfully which, for the aggressive dogs, the proper outcome would have been behavior.

52.     Instead, upon information and belief, Ferguson chose to outcome all the animals euthanized on October 9, 2014 "for space" and falsified more county records.

53.     In light of the egregious accusations hurled against Johnston, it is clear that prior to Johnston's arrival as the shelter director, the recorded outcome for many animals was not done truthfully and instead recorded to paint the LCSO and Borders in the most favorable way to the general public.

54.     Ferguson further broke directive by not following the long standing procedure that requires four (4) initials on every kennel card prior to euthanasia, two (2) from supervisors and two (2) from other employees.

55.     Johnston did not sign the kennel cards or order these animals to be euthanized and there were insufficient signatures to allow for the acts of euthanasia to have occurred.

56.     Pursuant to the directives of Luce and Major Wayne Longo ("Longo"), Johnston ordered Ferguson to follow the pre-existing LCSOAS policy as it was prior to October 1, 2014, until such time as the policy was improved by Johnston.

57.     Ferguson was well aware of what the policy was because she was the interim director prior to the official Sheriff's takeover of LCSOAS and Johnston being hired.

58.     At the time of this terrible and tragic event, Johnston's authority was completely usurped because she did not even have her own access to the shelter database and could only assess the situation through the representations Ferguson.

59.     Ferguson also blatantly lied to Johnston by failing to alert Johnston that a handshake agreement had been made with the volunteers to never euthanize dogs from the adoption floor without first asking the volunteers for help.

60.     Johnston would have had no way of knowing this and had been told on multiple occasions by her direct supervisor, Luce, to defer such questions to Ferguson.

61.     Most importantly, Johnston was not even in Lake County when the animals were euthanized.

62.     However, LCSO has led the public to believe that Johnston personally euthanized these animals when that was an impossibility.

63.     At the time of Ferguson's unilateral, inappropriate decisions, Johnston was on her way to Miami to attend classes toward her Master's Degree, an arrangement that had been prearranged with the Sheriff's Office prior to her being hired.

## The Termination

64.     Johnston was called into work at 5:30 p.m. on October 10, 2014 at which time she gave the aforementioned account of events.

65.     Longo placed her on the spot and asked how she was going to survive this politically.

66.     Her first response was for LCSO and LCSOAS to be truthful and admit that shelter records have been falsified for years and that her efforts were in the best interest of the pets by exposing the "no kill" game of keeping up to forty (40) dogs out of the public eye.

67.     The "no kill" game at LCSOAS was, and still is, keeping up to forty (40) dogs out of the public eye in an isolation building and then killing the dogs in isolation when space

10

was/is needed after a purported stray hold for these dogs has expired, and then recording the outcome for anything other than space whether truthful or not.

68.     This deceitful practice allowed LCSOAS to improperly tout itself to the general public that LCSOAS is a "no kill" shelter where adoptable animals are not euthanized for space.

69.     Longo indicated that being truthful to the public would never be permitted in the situation by the LCSO, leaving the only alternative of firing Johnston and allowing her to take the fall for recording the animals' outcome on October 9, 2014 for space.

70.     Borders had just taken over LCSOAS on October 1, 2014 from the control of the Lake County Commissioners ("LCC").

71.     If LCSO had allowed Johnston to be truthful to the public about the long standing practice of falsification of shelter euthanasia statistics, then LCSO would have admitted that policies in place by LCC, were in place with the intent to deceive the public.

72.     LCSO had not yet contravened the LCC policies and was continuing to deceive the public as its predecessor had and endorsed the practice of deceiving the public.

73.     Longo revealed to Johnston that Ferguson came to him crying, telling him that she did not want to kill those animals and that she was "ordered" to do so by Johnston ("Ferguson's Statement")[1]. Ferguson's Statement was a flat out, blatant lie since Johnston specifically instructed Ferguson to follow the pre-existing LCSOAS policy on making space for new intake animals.

---

[1] Borders First, Second, and Third Statements and Ferguson's Statement are collectively referred to hereinafter as "Defendants' Statements."

11

74.     At no time, did Johnston approve any list of pets to be killed.

75.     No investigation was ever conducted by LCSO regarding Johnston's version of the events because it was predetermined by Borders that Johnston would take the fall.

### Motivation for Ferguson to Lie

76.     Ferguson was the interim director until Johnston was hired as the Director, a position for which Ferguson also applied.

77.     In addition to the prestige of the title of Director, there was also a substantial annual pay increase of approximately $26,000.00 that Ferguson would have received if she had been selected as the Director.

78.     Understandably, Ferguson was bitter at Johnston from the beginning and challenged every directive given by Johnston.

79.     Ferguson waited until the first day Johnston had to leave work early for class to carry out the plan to get Johnston fired.

80.     On Johnston's first day as Director, Johnston specifically asked Longo and Luce if there was any one thing she was to focus on immediately and she was told no.

81.     Luce and Longo told Johnston to take the first couple of weeks to get a handle on things and then begin making recommendations and necessary changes.

82.     Longo instructed Johnston to clean things up so that the shelter would be in compliance with both the law and recognized shelter standards.

83.     Upon Johnston taking her position as Director, it became obvious that Ferguson was running LCSOAS incompetently, including allowing the euthanizing of animals without anesthesia, via a heart stick.

84.     On Johnston's first full day at the shelter, upon learning that under Ferguson's supervision the staff had been using intracardiac injections without anesthesia to euthanize the animals, Johnston gave an immediate order that euthanizing animals in this manner was to stop immediately because it was not only cruel and inhumane, but contrary to Florida law.

85.     Upon learning that Ferguson was feeding moldy food to the animals prior to the arrival of Johnston, in front of Lt. Jason Kerley ("Kerley"), Johnston instructed Ferguson to order new food, stop feeding moldy food to the animals immediately, and to discard the moldy food to ensure that no more moldy food would be fed to any animals at LCSOAS.

86.     Approximately two (2) days later, when Johnston asked Lorraine (Honey) Brown, who was in charge of procurement of food at LCSOAS, about the new shipment of food, Johnston learned that Ferguson ignored her directive and was still feeding moldy food to the animals.

87.     Johnston, again, directed Ferguson to order new food and Ferguson refused.

88.     Realizing that Ferguson was continuously ignoring all directives given by Johnston, Johnston ultimately made the arrangements to get food that was mold free.

89.     Johnston and Kerley witnessed one dog named "Socks," housed on the adoption floor, become uncontrollably aggressive and then go into full blown seizures, leading ultimately, to his being euthanized because of the inexplicable, sudden onset behavior.

90.     After discussing the situation of "Socks" with staff veterinarian, Dr. Julie-Ann Corda ("Corda"), Johnston learned that it is likely that mold ingestion and toxicity were the cause of the rapid decline of the animal.

13

91.     Immediately upon Johnston's arrival at LCSOAS, Johnston recognized the following, disturbing issues because the minimum standards of care for shelter animals were not met:

    a.     Dogs were housed in cages that did not meet minimum space requirements;

    b.     The database used to track animal movement around the shelter was inaccurate, making it impossible to crosscheck actual facts with the information contained therein;

    c.     Any and all felines (kittens included) alleged to have a behavioral issue or alleged to be feral were all placed in a dog holding kennel together, left to fight over space and food;

    d.     Adoptable cats were being kept thirty (30) to a dog cage and inventory was not conducted regularly;

    e.     Sick cats and healthy cats were being kept together;

    f.     Cats were not being tested for contagious feline diseases prior to being housed in these overcrowded cages; and

    g.     The controlled substance log was kept in pencil and on loose leaf sheets, failing to meet the minimum record keeping standards of controlled substances as imposed by the Food and Drug Administration.

92.     The biggest scam Johnston attempted to halt, a scam of which Ferguson and Borders are giant proponents, was the extra building of "isolation" dogs that the public and volunteers were never permitted to view, also referred to herein above as the "no kill" game played by LCSOAS.

14

93.    LCSO and LCSOAS continued to deceive the public by keeping approximately eighty-eight (88) dogs in "permanent" adoption areas, but never released the pictures of up to forty (40) dogs kept in the "isolation" area.

94.    The forty (40) isolation dogs could be euthanized for any reason as determined by Ferguson to deceive the public and make it appear as though no "adoptable" dogs were being euthanized.

95.    The forty (40) isolation dogs were never available for adoption to the public, their pictures never posted online for possible owner identification and were permitted to be killed on their fifth (5th) day in the shelter, under Ferguson's unsupported and improper interpretation of County Ordinance Section 4-9(b), as space was needed.

96.    The recorded outcome for any of the forty (40) isolation dogs was for any reason, arbitrarily determined by Ferguson, truthful or otherwise, for virtually anything except for "space."

97.    County Ordinance Section 4-9 requires that LCSOAS make reasonable efforts to ascertain, identify and/or notify owners of dogs being housed at LCSOAS, which Ordinance has not been followed because LCSOAS conceals the forty (40) isolation dogs from public view.

98.    Concealing the forty (40) isolation dogs within the isolation building gave LCSOAS a pool of animals to pull from whenever space was needed and allowed LCSOAS to record the outcome of the animals for whatever false reasons LCSOAS invented.

99.    Due to LCSOAS' concealment, the forty (40) isolation dogs were never seen by the public, and therefore no one could contest their behavior or condition.

15

100. In reality, the animals kept in the isolation building were strays that were held for five (5) days and then euthanized as soon as space was needed.

101. Johnston specifically ordered Ms. Ferguson not to pull the isolation animals for space when the animals' existence was not made known to the public.

102. Ferguson also wanted to euthanize a chocolate lab/pit bull mix, identified as #152178, that had been hit by a car, while Johnston wanted the dog to have a chance to mend and get acclimated to her surroundings before a behavioral and medical determination was made as to the adoptability of the animal.

103. #152178 was never posted online, did not have a picture in the database, was not available for view by the public and was never even given a name.

104. Ferguson pressed regularly to kill #152178 and made her disdain for Johnston and Johnston's orders and decisions clearly known by attempting to circumvent Johnston's directive by unnecessarily discussing the case with Corda in an effort to overturn Johnston's order.

105. When dealing with cats, LCSOAS relies heavily upon County Ordinance Section 4-9(c), which does not preclude anyone from falsely declaring an animal feral and then euthanizing said animal accordingly ("Feral animal policy").

106. Johnston observed friendly cats and young kittens in the overcrowded dog runs that were used to house feral cats prior to their demise.

107. The Feral animal policy existed well before Johnston's arrival and was on the top of Johnston's list of policies to change because of its potential for abuse.

108. This need for immediate change was made known to Kerley, Luce and Longo.

109.   As par for the course, Ferguson had no problems with the Feral animal policy and relied heavily upon it when she unilaterally decided to euthanize any living being.

**Conspiracy between Borders and Ferguson to Deprive Johnston of Civil Rights**

110.   Ferguson is still at LCSOAS and is once again the interim director running things without any oversight, free to kill any and all at animals within in her reach.

111.   Ferguson orchestrated the events of October 9, 2014 in an effort to have Johnston's employment terminated, in the hopes that Ferguson would officially be hired as the Director of LCSOAS.

112.   Borders and LCSO did not investigate the claims made by Ferguson and merely accepted them as true so that they could use Johnston as a political scapegoat in an effort to bolster the public's faith in Borders and LCSO's abilities to properly run LCSOAS.

113.   Borders and LCSO did not terminate the employment of Ferguson for being incompetent in her job performance, for being completely insubordinate to Johnston, or for lying about the need for space in an effort to orchestrate the events that ultimately led to the termination of Johnston's employment.

114.   On October 9, 2014, with Johnston on her way to Miami, Johnston deferred to Ferguson, the former interim director, to follow the pre-existing LCSOAS policy for making space for new intake animals when Ferguson personally and unnecessarily killed twenty (20) animals of her own accord.

115.   The very next day, on October 10, 2014, Johnston's employment was ultimately terminated for allegedly violating a "euthanasia policy" when Johnston was told to defer to Ferguson on LCSOAS policies until she could get up to speed.

17

116.    However, there was no written euthanasia policy in place making euthanasia a last resort when creating space at LCSOAS for new animals; any claim of such a "policy" by Borders, was, and still is, simply lip service given to the public at large as a manipulation tactic to garner support.

117.    Johnston personally believes euthanizing animals to make space should always be a last resort and that every effort possible should be made to give every animal a chance of live release.

118.    Johnston is also a firm believer that county records must be maintained in accordance with the law, in a true and transparent manner.

119.    All conditions precedent have been met prior to the filing of this action.

### COUNT I—VIOLATION OF 42 U.S.C. § 1983

120.    Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 119 as if specifically set forth herein.

121.    Borders personally, maliciously, and under color of state law deprived Plaintiff of her rights under the Fourteenth Amendment of the United States Constitution by immediately and continuously publicly defaming Johnston after her termination.

122.    Borders personally, maliciously, and under color of state law caused permanent injury to Plaintiff.

123.    Borders personally, maliciously, and under color of state law deprived Plaintiff of property and liberty without due process of law as guaranteed under the Fourteenth Amendment of the United States Constitution.

124.    This deprivation under color of state law is actionable under and may be

18

redressed by 42 U.S.C. §1983.

125.     Plaintiff is entitled to recover attorneys' fees and costs under 42 U.S.C. §1988.

WHEREFORE, Plaintiff, Jacquelyn Johnston, respectfully requests this Court grant judgment in her favor:

        (a)     awarding judgment against Defendants for special damages;

        (b)     awarding judgment against Defendants for compensatory damages;

        (c)     awarding judgment against Defendants for punitive damages;

        (d)     awarding Plaintiff reasonable attorneys' fees and costs; and

        (e)     for all other and further relief this Court deem just and proper.

## COUNT II—SLANDER *PER* SE
## INJURY TO PROFESSIONAL REPUTATION

126.     Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 119 as if specifically set forth herein.

127.     Defendants' Statements and publications described herein concerned Plaintiff and were false.

128.     Defendants' Statements were widely published and not privileged in any manner.

129.     Defendants' Statements were made with reckless disregard of their truth or falsity and/or with malice.

130.     Defendants' Statements were slanderous *per se* because they injured Plaintiff's professional reputation.

131.     Defendants' Statements forever falsely tainted and permanently damaged Plaintiff in the public perception.

132.    Plaintiff is entitled to recover attorneys' fees and costs under Florida Statute §768.28.

WHEREFORE, Plaintiff, Jacquelyn Johnston, respectfully requests this Court grant judgment in her favor:

(a)    awarding judgment against Defendants for compensatory damages;

(b)    awarding judgment against Defendants for punitive damages;

(c)    awarding Plaintiff reasonable attorneys' fees and costs; and

(d)    for all other and further relief this Court deem just and proper.

## COUNT III—SLANDER

133.    Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 119 as if specifically set forth herein.

134.    Defendants' Statements and publications described herein concerned Plaintiff and were false.

135.    Defendants' Statements were widely published and not privileged in any manner.

136.    Defendants' Statements were made with reckless disregard of their truth or falsity and/or with malice.

137.    Defendants had no reasonable grounds for believing the truth of their statements.

138.    Defendants' Statements forever falsely tainted and permanently damaged Plaintiff in the public perception.

139.    Plaintiff is entitled to recover attorneys' fees and costs under Florida Statute

20

§768.28.

WHEREFORE, Plaintiff, Jacquelyn Johnston, respectfully requests this Court grant judgment in her favor:

        (a)    awarding judgment against Defendants for compensatory damages;

        (b)    awarding judgment against Defendants for punitive damages;

        (c)    awarding Plaintiff reasonable attorneys' fees and costs; and

        (d)    for all other and further relief this Court deem just and proper.

## COUNT IV—LIBEL *PER SE*
## INJURY TO PROFESSIONAL REPUTATION

140.    Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 119 as if specifically set forth herein.

141.    Defendants' Statements and publications described herein concerned Plaintiff and were false.

142.    Defendants' Statements were widely published and not privileged in any manner.

143.    Defendants' Statements were made with reckless disregard of their truth or falsity and/or with malice.

144.    Defendants' Statements were libelous *per se* because they injured Plaintiff's professional reputation.

145.    Defendants' Statements forever falsely tainted and permanently damaged Plaintiff in the public perception.

146.    Plaintiff is entitled to recover attorneys' fees and costs under Florida Statute §768.28.

21

WHEREFORE, Plaintiff, Jacquelyn Johnston, respectfully requests this Court grant judgment in her favor:

        (a)    awarding judgment against Defendants for compensatory damages;

        (b)    awarding judgment against Defendants for punitive damages;

        (c)    awarding Plaintiff reasonable attorneys' fees and costs; and

        (d)    for all other and further relief this Court deem just and proper.

## COUNT V—LIBEL

147.    Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 119 as if specifically set forth herein.

148.    Defendants' Statements and publications described herein concerned Plaintiff and were false.

149.    Defendants' Statements were widely published and not privileged in any manner.

150.    Defendants' Statements were made with reckless disregard of their truth or falsity and/or with malice.

151.    Defendants had no reasonable grounds for believing the truth of their statements.

152.    Defendants' Statements forever falsely tainted and permanently damaged Plaintiff in the public perception.

153.    Plaintiff is entitled to recover attorneys' fees and costs under Florida Statute § 768.28.

WHEREFORE, Plaintiff, Jacquelyn Johnston, respectfully requests this Court grant

judgment in her favor:

      (a)    awarding judgment against Defendants for compensatory damages;

      (b)    awarding judgment against Defendants for punitive damages;

      (c)    awarding Plaintiff reasonable attorneys' fees and costs; and

      (d)    for all other and further relief this Court deem just and proper.

### COUNT VI—DEFAMATION BY IMPLICATION

154.    Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 119 as if specifically set forth herein.

155.    Defendants have defamed Plaintiff by knowingly, intentionally, willfully, recklessly, or negligently publishing statements about the Plaintiff they knew or should have known to be false or misleading.

156.    Defamation by implication is a cause of action that arises when one makes true statements, that are published, that defame an individual by creating a false impression from the face of the publication as a whole.

157.    The statements made by the Defendants, if any were true, were published in such a way as to create a false impression of Plaintiff in the public perception.

158.    The statements made by the Defendants, if any were true, were published in such a way as to mislead the public in its perception of the Plaintiff.

159.    Defendants' Statements were widely published and not privileged in any manner.

160.    Defendants' Statements forever falsely tainted and permanently damaged Plaintiff in the public perception.

23

161.    Plaintiff is entitled to recover attorneys' fees and costs under Florida Statute §768.28.

WHEREFORE, Plaintiff, Jacquelyn Johnston, respectfully requests this Court grant judgment in her favor:

        (a)     awarding judgment against Defendants for compensatory damages;

        (b)     awarding judgment against Defendants for punitive damages;

        (c)     awarding Plaintiff reasonable attorneys' fees and costs; and

        (d)     for all other and further relief this Court deem just and proper.

### COUNT VII— VIOLATION OF 42 U.S.C. § 1985

162.    Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 119 as if specifically set forth herein.

163.    Defendants conspired to injure Plaintiff by ruining her professional reputation in making and publishing false statements regarding Plaintiff.

164.    By destroying Plaintiff's professional reputation, Defendants have deprived Plaintiff of her right to make a living.

165.    Defendants made the false statements with malice and with reckless disregard for the truth or falsity of each statement.

166.    Defendants' statements forever falsely tainted and permanently damaged Plaintiff in the public perception.

167.    Both Defendants have continued to act in furtherance of the conspiracy in continuing to make false statements and/or not correcting the falsity of the statements.

168.    Plaintiff is entitled to recover attorneys' fees and costs under 42 U.S.C. §1988.

24

WHEREFORE, Plaintiff, Jacquelyn Johnston, respectfully requests this Court grant judgment in her favor:

   (a) awarding judgment against Defendants for special damages;

   (b) awarding judgment against Defendants for compensatory damages;

   (c) awarding judgment against Defendants for punitive damages;

   (d) awarding Plaintiff reasonable attorneys' fees and costs; and

   (e) for all other and further relief this Court deem just and proper.

## COUNT VIII— VIOLATION OF 42 U.S.C. § 1986

169. Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 119 as if specifically set forth herein.

170. As the conspirators, Defendants were aware of the conspiracy to injure Plaintiff's professional reputation by defaming Plaintiff through their false statements.

171. At any time, Defendants could have stopped the conspiracy and chose not to.

172. Failing to stop the conspiracy has forever falsely tainted and permanently damaged Plaintiff in the public perception.

173. Plaintiff is entitled to recover attorneys' fees and costs under 42 U.S.C. §1988.

WHEREFORE, Plaintiff, Jacquelyn Johnston, respectfully requests this Court grant judgment in her favor:

   (a) awarding judgment against Defendants for special damages;

   (b) awarding judgment against Defendants for compensatory damages;

   (c) awarding judgment against Defendants for punitive damages;

   (d) awarding Plaintiff reasonable attorneys' fees and costs; and

(e)     for all other and further relief this Court deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff respectfully demands a trial by jury for all

issues so triable.

Dated: June 8, 2015.                           Respectfully submitted,

By: /s/ Angelena M. Root
                                               Angelena M. Root, Esq.
                                               FBN: 101751
                                               Angelena M. Root, P.A.
                                               1931 Cordova Road, #303
                                               Fort Lauderdale, Florida 33316
                                               Ph: (954) 986-2101
                                               Fax: (954) 212-0774
                                               Email: amrootesq@gmail.com

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO.:

JACQEULYN JOHNSTON,

      Plaintiff,

v.

GARY S. BORDERS, individually and
in his official capacity as the Sheriff
of Lake County, Florida, and JENNIFER
FERGUSON,

      Defendants.

_____/

## VERIFICATION OF COMPLAINT PURSUANT TO 28 U.S.C. §1746

      I, Jacquelyn Johnston, the above-named Plaintiff, hereby verify under penalty of

perjury pursuant to 28 U.S.C. §1746 that the facts alleged in the foregoing Complaint are true

and correct to the best of my knowledge.

      This 8th day of June, 2015.

                                   _____

                                  By: Jacquelyn Johnston

27