UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO.: 6:15-cv-00936-PGB-DAB

JACQUELYN JOHNSTON,

      Plaintiff,

v.

GARY S. BORDERS, individually and
in his official capacity as the Sheriff
of Lake County, Florida, and JENNIFER
FERGUSON,

      Defendants.

_____/

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Jacquelyn Johnston ("Johnston" or "Plaintiff"), by and through her undersigned counsel, sues Defendants, Gary S. Borders, individually and in his official capacity as the Sheriff of Lake County, Florida ("Borders"), and Jennifer Ferguson ("Ferguson") (collectively "Defendants") and in support thereof states the following:

## NATURE OF THE CLAIMS, JURISDICTION, AND VENUE

1.      This is an action for monetary damages pursuant to 42 U.S.C. §1983 (hereinafter "1983"); 42 U.S.C. §1985, 42 U.S.C. §1986, common law Defamation by Implication; Defamation (libel and slander); and Defamation *per se* (libel *per se* and slander *per se*).

2.      Plaintiff invokes the federal question and civil rights jurisdiction of this Court pursuant to 28 U.S.C. §§1331 and 1343(a)(3) and (4).  Plaintiff also invokes this Court's supplemental jurisdiction over her state law claims that arise from the same nucleus of operative facts as the federal claims alleged herein pursuant to 28 U.S.C. §1367(a).

3.      Venue for this action lies in the Middle District of Florida pursuant to 28 U.S.C. §1391(b) and the actions upon which the matter are based took place in Lake County, Florida.

## PROCEDURAL BACKGROUND

4.      Plaintiff has complied with all conditions precedent to filing this action by sending certified return receipt notice of intent to sue in tort to Borders and the Department of Financial Services pursuant to Florida's Waiver of Sovereign Immunity law, Fla. Stat. §768.28, a copy of which is attached hereto as COMPOSITE EXHIBIT "A" and made a part hereof along with the return receipts ("Notice").

5.      Borders has not made a final disposition of Plaintiff's claim within six (6) months of the date he was provided with the attached Notice.

6.      Accordingly, Plaintiff's claims are deemed denied for the purposes of the notice requirements imposed by Fla. Stat. §768.28.

## PARTIES

7.      Johnston was, and still is, a resident of Miami-Dade County, Florida at all times pertinent hereto, is over the age of eighteen (18) and otherwise *sui juris*.

8.      Borders is the elected Sheriff of Lake County, Florida whose office is located at 360 W. Ruby Street, Tavares, Florida  32778.

9.      Ferguson works as the current supervisor of Lake County Sheriff's Office Animal Services ("LCSOAS") and is a resident of Seminole County.

10.     At all times pertinent hereto, Defendants are both over the age of eighteen (18) and otherwise *sui juris*.

11.     At all times pertinent hereto, LCSOAS was under the control of Borders.

2

## GENERAL FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

12.     On or about July 28, 2014, LCSO sought out Johnston and asked her to apply for the position of Director of LCSOAS.

13.     On October 1, 2014, after being hired by Borders, Johnston commenced her position as the Director of LCSOAS.

14.     On October 10, 2014, just nine (9) days after Johnston took over as the Director of LCSOAS, Borders terminated Johnston.

15.     Within minutes of the termination, at the direction of Borders, Lake County Sheriff's Office ("LCSO") released a statement surrounding the termination of Johnston's employment as the Director of LCSOAS.

16.     Borders announced Johnston was terminated after LCSO learned that on October 9, 2014, several animals at the shelter were euthanized despite an alleged policy wherein euthanizing animals was only to be a last resort.

17.     Borders is quoted as saying: "This decision was made on our watch and we have taken swift action to ensure it does not happen again." ("Borders First Statement")

18.     On October 11, 2014, upon information and belief at the authorization and behest of Borders, LCSO released the following account of the events surrounding the termination via it's spokesman, Sgt. Jim Vachon:

> Our administration was notified by a volunteer at Animal Services that up to 20 animals had been euthanized.  Law enforcement, especially, has a healthy respect for animals and what they can contribute, so it's a tough thing to hear.  A certain number of them were sick or injured which would be in our policy.  But certainly not all of them.

("Borders Second Statement")

19.     On October 13, 2014, upon information and belief at the authorization and behest of Borders, Lt. John Herrell disseminated the following information to the media surrounding the termination of Johnston:

> Johnston was terminated after LCSO learned that 147 animals were euthanized during her time as the Director of LCSOAS, including two (2) cats and eighteen (18) dogs in one day.  All but six of those animals were put down for legitimate reason including, but not limited to, aggression, sickness and injuries.  Some of the animals were put down prematurely because the shelter was not yet at capacity even though Johnston gave the reason for euthanizing the animals as limited space. Johnston did not exhaust all the resources to save the animals and exercised bad judgment.  Borders wants the shelter to be as close to a no-kill shelter as possible.  Because the killings happened on Johnston's watch, it was her responsibility.   Johnston made a bad call and euthanized some dogs that could have made good pets for people. That's why we took the action we did, to make sure something like this doesn't happen again.

("Borders Third Statement")

20.     Even if the numbers released by LCSO are accurate, these numbers were released without being put into perspective.

21.     The numbers may sound shocking to the general public, but there is no way to know, based on the information released by LCSO, how those numbers compare to the periods of time before Johnston arrived or after Johnston was terminated.

22.     These press releases were intended to destroy Johnston's reputation and to bolster the reputation of Borders in his takeover of LCSOAS.

23.     Following the release of the aforementioned press releases, news syndicates from all over Florida, Pittsburgh, Atlanta, New York, and as far away as London, picked up this story and published the numbers and circumstances surrounding the termination of Johnston's employment along with her photograph.

24.    The Examiner, a national internet publication, also picked up the story.

25.    Immediately following, comments and death threats were posted all over the internet regarding Johnston, including, but not limited to:  calling for her euthanasia, removal of any children or animals in her care, lighting her on fire, sodomizing her to death, murdering her, criminally prosecuting her for animal cruelty, etc.

26.    Johnston received comments and death threats on her own social media page on Facebook.

27.    Borders' publishing false statements and statistics without a point of reference and with the intent to cause harm, irreparably ruined Johnston's career and endangered her and her family.

28.    Johnston cannot find a job ANYWHERE, let alone in the animal services field, despite her qualifications, training, and experience because of the selective information released surrounding the termination of her employment.

29.    Despite her attempts to switch career fields, Johnston is still unable to make a sufficient living to support herself and her family.

30.    On October 14, 2014, Johnston, via counsel, reached out to LCSO after the various damning press releases, wherein she vehemently denied the allegations put forth in the media and requested a meeting so that a resolution could be reached.

31.    LCSO did not directly respond to Johnston, ever, and instead, released another statement that because Johnston was within a one-year probationary period, she could be terminated for any reason that fails to meet the sheriff's expectations.

32.     At no time, did LCSO offer or afford Johnston the right to a name-clearing hearing.

## The Events of October 9, 2014 that Led to the Termination

33.     Ferguson, the Kennel Supervisor, approached Johnston on the morning of October 9, 2014, a few hours before Johnston left to attend her Master's Class in Miami, Florida.

34.     At all times pertinent thereto, Johnston instructed Ferguson to follow policy as it existed prior to her arrival, as long as it was in accordance with Florida law, especially the pre-existing policy of LCSOAS regarding making space for new intake animals.

35.     There were various witnesses to Johnston's specific instructions to Ferguson to follow policy, including, but not limited to, Amber Teeter ("Teeter") and Diane Hagan ("Hagan").

36.     Captain Todd Luce ("Luce"), one of Johnston's supervisors, instructed Johnston to ask Ferguson about current LCSOAS policy until Johnston was up to speed, as the shelter had been without a real director since March 2014.

37.     Ferguson lied to Johnston about the pre-existing LCSOAS policy, that had been in effect prior to Johnston's arrival, for making space for new intake animals for her own personal gain.

38.     Johnston **NEVER** authorized Ferguson to do anything other than follow the pre-existing LCSOAS policy for making space for new intake animals and to record outcomes truthfully and accurately.

39.     Johnston specifically asked Ferguson if all rescues, volunteers, and fosters had been contacted before any animals were considered for euthanasia, to which Ferguson said she had contacted all rescues, volunteers, and fosters and that all fosters were full.

40.     Johnston then directed Ferguson to post a public call for more volunteers and foster homes on the Lake County Sheriff's Animal Services Facebook page.

41.     Johnston asked Ferguson, again, what the policy was when space is needed and Ferguson replied that space is made by euthanizing dogs from the isolation area that had not yet been posted as adoptable or made available for public viewing.

42.     Johnston asked Ferguson how many of the dogs from the isolation area had never been seen by the public and had behavioral issues to which Ferguson replied only one (1).

43.     Johnston was particularly concerned since many of the dogs on the adoption floor had been in their cages for over six (6) weeks, and the dogs in the isolation building had only been in the shelter for five (5) days.

44.     Johnston instructed Ferguson to first only euthanize dogs that were aggressive if space was needed per the pre-existing LCSOAS policy prior to the arrival of Johnston.

45.     Ferguson advised Johnston that more space was needed because dogs were being held in outdoor kennels without shade due to lack of indoor kennels.

46.     Based on the circumstances as conveyed to Johnston, Johnston agreed that under those specific, dangerously hot conditions, space needed to be created for the new intake animals.

47.     Johnston once again instructed Ferguson to follow the pre-existing LCSOAS policy, that had been in effect prior to Johnston's arrival, for making space for new intake animals and that Johnston would actively work to take action so that this situation would not arise again in the future.

48.     Johnston advised Ferguson in the form of a reprimand that in Ferguson's capacity as kennel supervisor, Ferguson's job was to manage the flow of animals and make the appropriate accommodations utilizing shelter resources so that a "space crisis" could be avoided at all times, including, but not limited to, **constantly** reaching out to rescues, fosters, and volunteers for their assistance, as opposed to **only** reaching out when a "space crisis" had already occurred.

49.     This conversation between Johnston and Ferguson was overheard by at least two (2) individuals, Teeter and Hagan, who can corroborate that Johnston demanded Ferguson on several occasions to follow the policies that were put in place prior to Johnston's arrival for the time being.

50.     Ferguson asked Johnston how Ferguson should outcome the euthanized animals in the computer system to which Johnston indicated that the outcomes should be recorded truthfully because Johnston was acutely aware that it is a misdemeanor and in violation of Florida Statutes §§823.15 and 839.13 to falsify county records.

51.     After Johnston left LCSOAS for the day to go to Miami to attend class, Ferguson went completely rogue, defied Johnston's instructions, pulled far more animals than necessary, and euthanized more animals than needed.

52.     Upon information and belief, Ferguson physically held each of the dogs during the euthanasia procedure.

53.     Ferguson informed Johnston space was needed for approximately eight (8) dogs, but Ferguson pulled one hundred twenty five percent (125%) more dogs than necessary and euthanized all of them.

54.     Ferguson reported to Johnston that in total, from isolation and the adoption floor, five to six (5-6) of the dogs euthanized were aggressive dogs.

55.     To be clear, Johnston's instructions to Ferguson were to pull the aggressive dogs first and outcome them truthfully which, for the aggressive dogs, the proper outcome would have been behavior.

56.     Instead, upon information and belief, Ferguson chose to outcome all the animals euthanized on October 9, 2014 "for space" and falsified more county records.

57.      In light of the egregious accusations hurled against Johnston, it is clear that prior to Johnston's arrival as the shelter director, the recorded outcome for many animals was not done truthfully and instead recorded to paint the LCSO and Borders in the most favorable way to the general public.

58.     Ferguson further broke directive by not following the long standing procedure that requires four (4) initials on every kennel card prior to euthanasia, two (2) from supervisors and two (2) from other employees.

59.     Johnston did not sign the kennel cards or order these animals to be euthanized and there were insufficient signatures to allow for the acts of euthanasia to have occurred.

60.     Pursuant to the directives of Luce and Major Wayne Longo ("Longo"), Johnston ordered Ferguson to follow the pre-existing LCSOAS policy as it was prior to October 1, 2014, until such time as the policy was improved by Johnston.

61.     Ferguson was well aware of what the policy was because she was the interim director prior to the official Sheriff's takeover of LCSOAS and Johnston being hired.

62.     At the time of this terrible and tragic event, Johnston's authority was completely usurped because she did not even have her own access to the shelter database and could only assess the situation through the representations Ferguson.

63.     Ferguson also blatantly lied to Johnston by failing to alert Johnston that a handshake agreement had been made with the volunteers to never euthanize dogs from the adoption floor without first asking the volunteers for help.

64.     Johnston would have had no way of knowing this and had been told on multiple occasions by her direct supervisor, Luce, to defer such questions to Ferguson.

65.     Most importantly, Johnston was not even in Lake County when the animals were euthanized.

66.     However, LCSO has led the public to believe that Johnston personally euthanized these animals when that was an impossibility.

67.     At the time of Ferguson's unilateral, inappropriate decisions, Johnston was on her way to Miami to attend classes toward her Master's Degree, an arrangement that had been prearranged with the Sheriff's Office prior to her being hired.

**The Termination**

68.     Johnston was called into work at 5:30 p.m. on October 10, 2014 at which time she gave the aforementioned account of events.

69.     Longo placed her on the spot and asked how she was going to survive this politically.

70.     Her first response was for LCSO and LCSOAS to be truthful and admit that shelter records have been falsified for years and that her efforts were in the best interest of the pets by exposing the "no kill" game of keeping up to forty (40) dogs out of the public eye.

71.     The "no kill" game at LCSOAS was, and still is, keeping up to forty (40) dogs out of the public eye in an isolation building and then killing the dogs in isolation when space was/is needed after a purported stray hold for these dogs has expired, and then recording the outcome for anything other than space whether truthful or not.

72.     This deceitful practice allowed LCSOAS to improperly tout itself to the general public that LCSOAS is a "no kill" shelter where adoptable animals are not euthanized for space.

73.     Longo indicated that being truthful to the public would never be permitted in the situation by the LCSO, leaving the only alternative of firing Johnston and allowing her to take the fall for recording the animals' outcome on October 9, 2014 for space.

74.     Borders had just taken over LCSOAS on October 1, 2014 from the control of the Lake County Commissioners ("LCC").

75.     If LCSO had allowed Johnston to be truthful to the public about the long standing practice of falsification of shelter euthanasia statistics, then LCSO would have admitted that policies in place by LCC, were in place with the intent to deceive the public.

76.     LCSO had not yet contravened the LCC policies and was continuing to deceive the public as its predecessor had and endorsed the practice of deceiving the public.

77.     Longo revealed to Johnston that Ferguson came to him crying, telling him that she did not want to kill those animals and that she was "ordered" to do so by Johnston ("Ferguson's Statement")[1].   Ferguson's Statement was a flat out, blatant lie since Johnston specifically instructed Ferguson to follow the pre-existing LCSOAS policy on making space for new intake animals.

78.     At no time, did Johnston approve any list of pets to be killed.

79.     Without giving specific names, Longo also informed Johnston that LCSO received an influx of telephone calls from volunteers and members of the general public upset that Johnston had ordered Ferguson to euthanize adoptable animals.   Despite Johnston's repeated demands for names of individuals, Longo refused to provide any such names.

80.     Upon information and belief, the only way that volunteers and members of the general public could learn Ferguson's version of events is if Ferguson herself gave Ferguson's Statement to at least one unnamed volunteer or member of the general public.[2]

81.     No investigation was ever conducted by LCSO regarding Johnston's version of the events because it was predetermined by Borders that Johnston would take the fall.

---

[1] Borders First, Second, and Third Statements and Ferguson's Statement are collectively referred to hereinafter as "Defendants' Statements."

82.     To be clear and as detailed below, Ferguson made Ferguson's Statement in bad faith since she knew the statement was not true.

83.     Ferguson, acting outside the scope of her employment and in contravention of the alleged goals of LCSO, orchestrated the events of October 9, 2014 with the malicious purpose of getting Johnston terminated.

### Motivation for Ferguson to Lie

84.     Ferguson was the interim director until Johnston was hired as the Director, a position for which Ferguson also applied.

85.     In addition to the prestige of the title of Director, there was also a substantial annual pay increase of approximately $26,000.00 that Ferguson would have received if she had been selected as the Director.

86.     Understandably, Ferguson was bitter at Johnston from the beginning and challenged every directive given by Johnston.

87.     Ferguson waited until the first day Johnston had to leave work early for class to carry out the plan to get Johnston fired.

88.     On Johnston's first day as Director, Johnston specifically asked Longo and Luce if there was any one thing she was to focus on immediately and she was told no.

89.     Luce and Longo told Johnston to take the first couple of weeks to get a handle on things and then begin making recommendations and necessary changes.

90.     Longo instructed Johnston to clean things up so that the shelter would be in compliance with both the law and recognized shelter standards.

91.     Upon Johnston taking her position as Director, it became obvious that Ferguson was running LCSOAS incompetently, including allowing the euthanizing of animals without anesthesia, via a heart stick.

92.     On Johnston's first full day at the shelter, upon learning that under Ferguson's supervision the staff had been using intracardiac injections without anesthesia to euthanize the animals, Johnston gave an immediate order that euthanizing animals in this manner was to stop immediately because it was not only cruel and inhumane, but contrary to Florida law.

93.     Upon learning that Ferguson was feeding moldy food to the animals prior to the arrival of Johnston, in front of Lt. Jason Kerley ("Kerley"), Johnston instructed Ferguson to order new food, stop feeding moldy food to the animals immediately, and to discard the moldy food to ensure that no more moldy food would be fed to any animals at LCSOAS.

94.     Approximately two (2) days later, when Johnston asked Lorraine (Honey) Brown, who was in charge of procurement of food at LCSOAS, about the new shipment of food, Johnston learned that Ferguson ignored her directive and was still feeding moldy food to the animals.

95.     Johnston, again, directed Ferguson to order new food and Ferguson refused.

96.     Realizing that Ferguson was continuously ignoring all directives given by Johnston, Johnston ultimately made the arrangements to get food that was mold free.

97.     Johnston and Kerley witnessed one dog named "Socks," housed on the adoption floor, become uncontrollably aggressive and then go into full blown seizures, leading ultimately, to his being euthanized because of the inexplicable, sudden onset behavior.

98.     After discussing the situation of "Socks" with staff veterinarian, Dr. Julie-Ann Corda ("Corda"), Johnston learned that it is likely that mold ingestion and toxicity were the cause of the rapid decline of the animal.

99.     Immediately upon Johnston's arrival at LCSOAS, Johnston recognized the following, disturbing issues because the minimum standards of care for shelter animals were not met:

   a.     Dogs were housed in cages that did not meet minimum space requirements;

   b.     The database used to track animal movement around the shelter was inaccurate, making it impossible to crosscheck actual facts with the information contained therein;

   c.     Any and all felines (kittens included) alleged to have a behavioral issue or alleged to be feral were all placed in a dog holding kennel together, left to fight over space and food;

   d.     Adoptable cats were being kept thirty (30) to a dog cage and inventory was not conducted regularly;

   e.     Sick cats and healthy cats were being kept together;

   f.     Cats were not being tested for contagious feline diseases prior to being housed in these overcrowded cages; and

   g.     The controlled substance log was kept in pencil and on loose leaf sheets, failing to meet the minimum record keeping standards of controlled substances as imposed by the Food and Drug Administration.

100.    The biggest scam Johnston attempted to halt, a scam of which Ferguson and Borders are giant proponents, was the extra building of "isolation" dogs that the public and

volunteers were never permitted to view, also referred to herein above as the "no kill" game played by LCSOAS.

101.    LCSO and LCSOAS continued to deceive the public by keeping approximately eighty-eight (88) dogs in "permanent" adoption areas, but never released the pictures of up to forty (40) dogs kept in the "isolation" area.

102.    The forty (40) isolation dogs could be euthanized for any reason as determined by Ferguson to deceive the public and make it appear as though no "adoptable" dogs were being euthanized.

103.    The forty (40) isolation dogs were never available for adoption to the public, their pictures never posted online for possible owner identification and were permitted to be killed on their fifth (5th) day in the shelter, under Ferguson's unsupported and improper interpretation of County Ordinance Section 4-9(b), as space was needed.

104.    The recorded outcome for any of the forty (40) isolation dogs was for any reason, arbitrarily determined by Ferguson, truthful or otherwise, for virtually anything except for "space."

105.    County Ordinance Section 4-9 requires that LCSOAS make reasonable efforts to ascertain, identify and/or notify owners of dogs being housed at LCSOAS, which Ordinance has not been followed because LCSOAS conceals the forty (40) isolation dogs from public view.

106.    Concealing the forty (40) isolation dogs within the isolation building gave LCSOAS a pool of animals to pull from whenever space was needed and allowed LCSOAS to record the outcome of the animals for whatever false reasons LCSOAS invented.

107.    Due to LCSOAS' concealment, the forty (40) isolation dogs were never seen by the public, and therefore no one could contest their behavior or condition.

108.    In reality, the animals kept in the isolation building were strays that were held for five (5) days and then euthanized as soon as space was needed.

109.    Johnston specifically ordered Ms. Ferguson not to pull the isolation animals for space when the animals' existence was not made known to the public.

110.    Ferguson also wanted to euthanize a chocolate lab/pit bull mix, identified as #152178, that had been hit by a car, while Johnston wanted the dog to have a chance to mend and get acclimated to her surroundings before a behavioral and medical determination was made as to the adoptability of the animal.

111.    #152178 was never posted online, did not have a picture in the database, was not available for view by the public and was never even given a name.

112.    Ferguson pressed regularly to kill #152178 and made her disdain for Johnston and Johnston's orders and decisions clearly known by attempting to circumvent Johnston's directive by unnecessarily discussing the case with Corda in an effort to overturn Johnston's order.

113.    When dealing with cats, LCSOAS relies heavily upon County Ordinance Section 4-9(c), which does not preclude anyone from falsely declaring an animal feral and then euthanizing said animal accordingly ("Feral animal policy").

114.    Johnston observed friendly cats and young kittens in the overcrowded dog runs that were used to house feral cats prior to their demise.

115.    The Feral animal policy existed well before Johnston's arrival and was on the top of Johnston's list of policies to change because of its potential for abuse.

116.    This need for immediate change was made known to Kerley, Luce and Longo.

117.    As par for the course, Ferguson had no problems with the Feral animal policy and relied heavily upon it when she unilaterally decided to euthanize any living being.

**Conspiracy between Borders and Ferguson to Deprive Johnston of Civil Rights**

118.    Ferguson is still at LCSOAS and is once again the interim director running things without any oversight, free to kill any and all at animals within in her reach.

119.    Ferguson orchestrated the events of October 9, 2014 in an effort to have Johnston's employment terminated, in the hopes that Ferguson would officially be hired as the Director of LCSOAS which would also result in a pay increase.

120.    Borders and LCSO did not investigate the claims made by Ferguson and merely accepted them as true so that they could use Johnston as a political scapegoat in an effort to bolster the public's faith in Borders and LCSO's abilities to properly run LCSOAS.

121.    Borders is also up for re-election in 2016, so anything he can do to gain the increased trust of the general public, helps him personally and his chances for winning re-election.

122.    Borders and LCSO kept Ferguson as an employee of LCSO and did not terminate the employment of Ferguson for being incompetent in her job performance, for being completely insubordinate to Johnston, or for lying about the need for space in an effort to orchestrate the events that ultimately led to the termination of Johnston's employment.

123.    On October 9, 2014, with Johnston on her way to Miami, Johnston deferred to Ferguson, the former interim director, to follow the pre-existing LCSOAS policy for making space for new intake animals when Ferguson personally and unnecessarily killed twenty (20) animals of her own accord.

124.    The very next day, on October 10, 2014, Johnston's employment was ultimately terminated for allegedly violating a "euthanasia policy" when Johnston was told to defer to Ferguson on LCSOAS policies until she could get up to speed.

125.    However, there was no written euthanasia policy in place making euthanasia a last resort when creating space at LCSOAS for new animals; any claim of such a "policy" by Borders, was, and still is, simply lip service given to the public at large as a manipulation tactic to garner support.

126.    Johnston personally believes euthanizing animals to make space should always be a last resort and that every effort possible should be made to give every animal a chance of live release.

127.    Johnston is also a firm believer that county records must be maintained in accordance with the law, in a true and transparent manner.

128.    All conditions precedent have been met prior to the filing of this action.

### COUNT I—VIOLATION OF 42 U.S.C. § 1983
**(Against Borders in his individual and official capacities)**

129.    Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 128 as if specifically set forth herein.

130.    Borders personally, maliciously, and under color of state law deprived Plaintiff of her liberty interest in her good name, reputation, honor, and integrity without due process

of law afforded to her under the Fourteenth Amendment of the United States Constitution.

131.    Johnston has a constitutionally protected liberty interest in remaining free of false, stigmatizing dissemination to the public in connection with her termination without receiving any meaningful opportunity to clear her name.

132.    Johnston has a constitutionally protected liberty interest in living and working where she chooses in her chosen profession and to engage in the common occupations of life.

133.    Borders personally, maliciously, and under color of state law made false statements of a stigmatizing nature to the public that caused permanent injury to Plaintiff depriving her of her ability to work and make a living in helping to support herself and her family.

134.    Borders personally, maliciously, and under color of state law made false statements of a stigmatizing nature to the public in connection with Plaintiff's termination as a LCSO employee.

135.    LCSO is a governmental employer of which Borders is the sheriff.

136.    Johnston was discharged without being afforded or informed of a meaningful opportunity to clear her name via a post-termination hearing.

137.    To be afforded due process within the meaning of the Fourteenth Amendment of the Constitution of the United States, LCSO was required to provide an opportunity for a name-clearing hearing and had an affirmative duty to inform Johnston of such an opportunity.

138.    This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. §1983.

139.    Plaintiff is entitled to recover attorneys' fees and costs under 42 U.S.C. §1988.

WHEREFORE, Plaintiff, Jacquelyn Johnston, respectfully requests this Court grant judgment in her favor:

(a)     awarding judgment against Defendants for special damages;

(b)     awarding judgment against Defendants for compensatory damages;

(c)     awarding judgment against Defendants for punitive damages;

(d)     awarding Plaintiff reasonable attorneys' fees and costs; and

(e)     for all other and further relief this Court deem just and proper.

## COUNT II—SLANDER *PER* SE
## INJURY TO PROFESSIONAL REPUTATION
### (Against Ferguson and Borders in his official capacity)

140.     Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 128 as if specifically set forth herein.

141.     Defendants' Statements and publications described herein concerned Plaintiff and were false.

142.     Defendants' Statements were widely published and not privileged in any manner.

143.     Defendants' Statements were made with reckless disregard of their truth or falsity and/or with malice.

144.     Defendants' Statements were slanderous *per se* because they injured Plaintiff's professional reputation.

145.     Defendants' Statements forever falsely tainted and permanently damaged Plaintiff in the public perception.

146.     Plaintiff is entitled to recover attorneys' fees and costs under Florida Statute

§768.28.

WHEREFORE, Plaintiff, Jacquelyn Johnston, respectfully requests this Court grant judgment in her favor:

> (a)     awarding judgment against Defendants for compensatory damages;
>
> (b)     awarding judgment against Defendants for punitive damages;
>
> (c)     awarding Plaintiff reasonable attorneys' fees and costs; and
>
> (d)     for all other and further relief this Court deem just and proper.

### COUNT III—SLANDER
**(Against Ferguson and Borders in his official capacity)**

147.    Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 128 as if specifically set forth herein.

148.    Defendants' Statements and publications described herein concerned Plaintiff and were false.

149.    Defendants' Statements were widely published and not privileged in any manner.

150.    Defendants' Statements were made with reckless disregard of their truth or falsity and/or with malice.

151.    Defendants had no reasonable grounds for believing the truth of their statements.

152.    Defendants' Statements forever falsely tainted and permanently damaged Plaintiff in the public perception.

153.    Plaintiff is entitled to recover attorneys' fees and costs under Florida Statute §768.28.

WHEREFORE, Plaintiff, Jacquelyn Johnston, respectfully requests this Court grant judgment in her favor:

  (a)  awarding judgment against Defendants for compensatory damages;

  (b)  awarding judgment against Defendants for punitive damages;

  (c)  awarding Plaintiff reasonable attorneys' fees and costs; and

  (d)  for all other and further relief this Court deem just and proper.

**COUNT IV—LIBEL *PER SE***
**INJURY TO PROFESSIONAL REPUTATION**
**(Against Ferguson and Borders in his official capacity)**

154. Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 128 as if specifically set forth herein.

155. Defendants' Statements and publications described herein concerned Plaintiff and were false.

156. Defendants' Statements were widely published and not privileged in any manner.

157. Defendants' Statements were made with reckless disregard of their truth or falsity and/or with malice.

158. Defendants' Statements were libelous *per se* because they injured Plaintiff's professional reputation.

159. Defendants' Statements forever falsely tainted and permanently damaged Plaintiff in the public perception.

160. Plaintiff is entitled to recover attorneys' fees and costs under Florida Statute §768.28.

WHEREFORE, Plaintiff, Jacquelyn Johnston, respectfully requests this Court grant judgment in her favor:

        (a)     awarding judgment against Defendants for compensatory damages;

        (b)     awarding judgment against Defendants for punitive damages;

        (c)     awarding Plaintiff reasonable attorneys' fees and costs; and

        (d)     for all other and further relief this Court deem just and proper.

## COUNT V—LIBEL
### (Against Ferguson and Borders in his official capacity)

161. Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 128 as if specifically set forth herein.

162. Defendants' Statements and publications described herein concerned Plaintiff and were false.

163. Defendants' Statements were widely published and not privileged in any manner.

164. Defendants' Statements were made with reckless disregard of their truth or falsity and/or with malice.

165. Defendants had no reasonable grounds for believing the truth of their statements.

166. Defendants' Statements forever falsely tainted and permanently damaged Plaintiff in the public perception.

167. Plaintiff is entitled to recover attorneys' fees and costs under Florida Statute § 768.28.

WHEREFORE, Plaintiff, Jacquelyn Johnston, respectfully requests this Court grant

judgment in her favor:

        (a)     awarding judgment against Defendants for compensatory damages;

        (b)     awarding judgment against Defendants for punitive damages;

        (c)     awarding Plaintiff reasonable attorneys' fees and costs; and

        (d)     for all other and further relief this Court deem just and proper.

## COUNT VI—DEFAMATION BY IMPLICATION
### (Against Borders in his official capacity)

168.    Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 128 as if specifically set forth herein.

169.    Defendants have defamed Plaintiff by knowingly, intentionally, willfully, recklessly, or negligently publishing statements about the Plaintiff they knew or should have known to be false or misleading.

170.    Defamation by implication is a cause of action that arises when one makes true statements, that are published, that defame an individual by creating a false impression from the face of the publication as a whole.

171.    The statements made by the Defendants, if any were true, were published in such a way as to create a false impression of Plaintiff in the public perception.

172.    The statements made by the Defendants, if any were true, were published in such a way as to mislead the public in its perception of the Plaintiff.

173.    Defendants' Statements were widely published and not privileged in any manner.

174.    Defendants' Statements forever falsely tainted and permanently damaged Plaintiff in the public perception.

175.    Plaintiff is entitled to recover attorneys' fees and costs under Florida Statute §768.28.

WHEREFORE, Plaintiff, Jacquelyn Johnston, respectfully requests this Court grant judgment in her favor:

(a)    awarding judgment against Defendants for compensatory damages;

(b)    awarding judgment against Defendants for punitive damages;

(c)    awarding Plaintiff reasonable attorneys' fees and costs; and

(d)    for all other and further relief this Court deem just and proper.

## COUNT VII— VIOLATION OF 42 U.S.C. § 1985
### (Against all Defendants)

176.    Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 128 as if specifically set forth herein.

177.    Defendants conspired to injure Plaintiff by ruining her professional reputation in making and publishing false statements regarding Plaintiff.

178.    By destroying Plaintiff's professional reputation, Defendants have deprived Plaintiff of her right to make a living.

179.    Defendants made the false statements with malice and with reckless disregard for the truth or falsity of each statement.

180.    Defendants' statements forever falsely tainted and permanently damaged Plaintiff in the public perception.

181.    Both Defendants have continued to act in furtherance of the conspiracy in continuing to make false statements and/or not correcting the falsity of the statements.

182.    Plaintiff is entitled to recover attorneys' fees and costs under 42 U.S.C. §1988.

WHEREFORE, Plaintiff, Jacquelyn Johnston, respectfully requests this Court grant judgment in her favor:

      (a)    awarding judgment against Defendants for special damages;

      (b)    awarding judgment against Defendants for compensatory damages;

      (c)    awarding judgment against Defendants for punitive damages;

      (d)    awarding Plaintiff reasonable attorneys' fees and costs; and

      (e)    for all other and further relief this Court deem just and proper.

### COUNT VIII— VIOLATION OF 42 U.S.C. § 1986
**(Against all Defendants)**

183.    Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 128 as if specifically set forth herein.

184.    As the conspirators, Defendants were aware of the conspiracy to injure Plaintiff's professional reputation by defaming Plaintiff through their false statements.

185.    At any time, Defendants could have stopped the conspiracy and chose not to.

186.    Failing to stop the conspiracy has forever falsely tainted and permanently damaged Plaintiff in the public perception.

187.    Plaintiff is entitled to recover attorneys' fees and costs under 42 U.S.C. §1988.

WHEREFORE, Plaintiff, Jacquelyn Johnston, respectfully requests this Court grant judgment in her favor:

      (a)    awarding judgment against Defendants for special damages;

      (b)    awarding judgment against Defendants for compensatory damages;

      (c)    awarding judgment against Defendants for punitive damages;

      (d)    awarding Plaintiff reasonable attorneys' fees and costs; and

(e)      for all other and further relief this Court deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff respectfully demands a trial by jury for all issues so triable.

Dated: August 31, 2015.                    Respectfully submitted,


By: */s/ Angelena M. Root*_____
      Angelena M. Root, Esq.
      FBN: 101751
      Angelena M. Root, P.A.
      1931 Cordova Road, #303
      Fort Lauderdale, Florida  33316
      Ph: (954) 986-2101
      Fax: (954) 212-0774
      Email: amrootesq@gmail.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 11, 2015, the foregoing was filed with Court via CM/ECF and served via CM/ECF upon counsel for Defendants to Mark E. Levitt, Esq. at mlevitt@anblaw.com,           kmaxson@anblaw.com,           pjones@anblaw.com, trodriguez@anblaw.com and to Matthew Christian Neff, Esq. at mneff@anblaw.com.

By: */s/ Angelena M. Root*_____
      Angelena M. Root, Esq.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO.: 6:15-cv-00936-PGB-DAB

JACQEULYN JOHNSTON,

       Plaintiff,

v.

GARY S. BORDERS, individually and
in his official capacity as the Sheriff
of Lake County, Florida, and JENNIFER
FERGUSON,

       Defendants.

_____/

## VERIFICATION OF COMPLAINT PURSUANT TO 28 U.S.C. §1746

I, Jacquelyn Johnston, the above-named Plaintiff, hereby verify under penalty of perjury pursuant to 28 U.S.C. §1746 that the facts alleged in the foregoing Complaint are true and correct to the best of my knowledge.

This 31st day of August, 2015.

By: Jacquelyn Johnston

29

**ANGELENA M. ROOT, P.A.**
1931 Cordova Road, #303
Fort Lauderdale, Florida 33316
(954) 986-2101 - amrootesq@gmail.com

November 3, 2014

**VIA EMAIL, CERTIFIED
AND REGULAR U.S. MAIL**
Sheriff Gary Borders
Lake County Sheriff's Office
360 West Ruby Street
Tavares, FL  32778-3826

David W. Porter, Esq.
Lake County Sheriff's Office
360 West Ruby Street
Tavares, FL  32778-3826
David.Porter@lcso.org

David Heath, County Manager
315 West Main Street
P.O. Box 7800
Tavares, FL  32778-7800

Sanford A. Minkoff, Esq.
County Attorney
315 West Main Street
P.O. Box 7800
Tavares, FL  32778-7800
sminkoff@lakecountyfl.gov

Timothy I. Sullivan
Commissioner, District 1
315 West Main Street
P.O. Box 7800
Tavares, FL  32778-7800

Sean Parks
Commissioner, District 2
315 West Main Street
P.O. Box 7800
Tavares, FL  32778-7800

Jimmy Conner
Commissioner, District 3
315 West Main Street
P.O. Box 7800
Tavares, FL  32778-7800

Leslie Campione
Commissioner, District 4
315 West Main Street
P.O. Box 7800
Tavares, FL  32778-7800

Welton G. Caldwell
Commissioner, District 5
315 West Main Street
P.O. Box 7800
Tavares, FL  32778-7800

Re:   Statutory Notice of Claim of Jacquelyn Johnston, pursuant to Florida Statutes §768.28
      Claimant's Date of Birth: February 5, 1982
      Claimant's Social Security Number: 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
      Claimant's Place of Birth: Memphis, TN

Dear Sheriff Borders, Messrs. Porter, Heath, and Minkoff,
Commissioners Sullivan, Parks, Conner, Campione and Cladwell:

Please be advised that this law firm represents Jacquelyn Johnston, regarding all claims for damages arising out of the several false and/or misleading statements made by or at the behest of Sheriff Borders and his staff immediately after the termination of Ms. Johnston from the Lake County Sheriff's Department on October 10, 2014 ("termination date").

COMPOSITE EXHIBIT "A"

This letter shall serve as official notification of the claims for defamation, defamation per se and defamation by implication on behalf of Ms. Johnston pursuant to Florida's Waiver of Sovereign Immunity Statute, Fla. Stat. § 768.28. Please notify the undersigned within the statutory period whether you will accept or deny responsibility for these false and defamatory statements.

This letter is not intended to constitute, nor shall it be deemed to constitute, a full statement of all facts, rights or claims relating to this matter, nor is it intended, nor should it be construed as a waiver, release or relinquishment of any rights or remedies available to my Client, whether legal or equitable, all of which are hereby expressly reserved.

Based upon information and belief, there exists no prior adjudicated unpaid claim in excess of $200 against Ms. Johnston.

In the event you feel that this Notice does not comply with the statutory requirements of Florida's Waiver of Sovereign Immunity Law, please advise us of same, immediately.

Should you have any questions, please do not hesitate to contact me directly.

Sincerely,

Angelena M. Root

cc:
State of Florida
Department of Financial Services
200 E. Gaines Street
Tallahassee, FL  32399-0300

■ Complete items 1, 2, and 3. Also complete
item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
or on the front if space permits.

A. Signature

X Barry MacDonald

☑ Agent
☐ Addressee

B. Received by (Printed Name)

BARRY MAEDnaid

C. Date of Delivery

11-6-14

1. Article Addressed to:

David W. Porter, Esq.
Lake County Sheriff's Office
360 West Ruby Street
Tavares, FL 32778-3826

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)

7003 1680 0000 2311 2479

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

A. Signature

X *Barry S macDonald*  ☑ Agent  ☐ Addressee

B. Received by (Printed Name) | C. Date of Delivery
BARRY MACDonald | 11-6-14

1. Article Addressed to:

Sheriff Gary Borders
Lake County Sheriff's Office
360 West Ruby Street
Tavares, FL 32778-3826

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
(Transfer from service label)

7003 1680 0000 2311 2387

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

State of Florida
Department of Financial Services
200 E. Gaines Street
Tallahassee, FL 32399-0300

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X  F.N. Nicholson

☐ Agent
☐ Addressee

B. Received by (Printed Name)  |  C. Date of Delivery

Received by: F.N. Nicholson

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
(Transfer from service label)

7003 1680 0000 2311 2455

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Reciept Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

Sent To

FL - DFS

Street, Apt. No.;
or PO Box No.

City, State, ZIP+4

PS Form 3800, June 2002     See Reverse for Instruction



Angelena M. Root, P.A.
1931 Cordova Road, #303
Fort Lauderdale, FL  33316



**CERTIFIED MAIL**™

7003 1680 0000 2311 2

$6.480

US POSTAGE
FIRST-CLASS
33316 NOV 03 2014

stamps.com

062S000082973 6

State of Florida
Department of Financial Services
200 E. Gaines Street
Tallahassee FL 32399-0300

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

| **SENDER: COMPLETE THIS SECTION** | **COMPLETE THIS SECTION ON DELIVERY** | |
|---|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br><br>X | ☐ Agent<br>☐ Addressee |
| | B. Received by (*Printed Name*) | C. Date of Delivery |

1. Article Addressed to:

State of Florida
Department of Financial Services
200 E. Gaines Street
Tallahassee, FL  32399-0300

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☐ Certified Mail     ☐ Express Mail
   ☐ Registered         ☐ Return Receipt for Merchandise
   ☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*)          ☐ Yes

2. Article Number
   (*Transfer from service label*)          7003 1680 0000 2311 2455

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540

## U.S. Postal Service™

## CERTIFIED MAIL™ RECEIPT

### (Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

# OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Reciept Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

Sent To

Street, Apt. No.; or PO Box No. _Porter_

City, State, ZIP+4

PS Form 3800, June 2002          See Reverse for Instruction



Angelena M. Root, P.A.
1931 Cordova Road, #303
Fort Lauderdale, FL 33316



**CERTIFIED MAIL™**

7003 1680 0000 2311 2479

$6.48⁰
US POSTAGE
FIRST-CLASS
33316 NOV 03 2014

David W. Porter, Esq
Lake County Sheriff's Office
360 West Ruby Street
Tavares FL 32778-3826

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X     ☐ Agent   ☐ Addressee<br>B. Received by (*Printed Name*)   C. Date of Delivery |
| 1. Article Addressed to:<br><br>David W. Porter, Esq.<br>Lake County Sheriff's Office<br>360 West Ruby Street<br>Tavares, FL  32778-3826 | D. Is delivery address different from item 1? ☐ Yes<br>    If YES, enter delivery address below: ☐ No |
| | 3. Service Type<br>☐ Certified Mail   ☐ Express Mail<br>☐ Registered   ☐ Return Receipt for Merchandise<br>☐ Insured Mail   ☐ C.O.D.<br>4. Restricted Delivery? (*Extra Fee*)     ☐ Yes |
| 2. Article Number<br>(Transfer from service label) | 7003 1680 0000 2311 2479 |

PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540

# U.S. Postal Service™
## CERTIFIED MAIL™ RECEIPT
*(Domestic Mail Only; No Insurance Coverage Provided)*

**For delivery information visit our website at www.usps.com®**

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | |
| Certified Fee | | |
| Return Reciept Fee (Endorsement Required) | | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To

Street, Apt. No.; or PO Box No.    BORDERS

City, State, ZIP+4

PS Form 3800, June 2002      See Reverse for Instructions



Angelena M. Root, P.A.
1931 Cordova Road, #303
Fort Lauderdale, FL 33316

**CERTIFIED MAIL**™

7003 1680 0000 2311 2387

$6.48
US POSTAGE
FIRST-CLASS
33316 NOV 03 2014

0625000862973 6

stamps
.com

Sheriff Gary S. Borders
Lake County Sheriff's Office
360 West Ruby Street
Tavares FL 32778-3826

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

| SENDER: *COMPLETE THIS SECTION* | *COMPLETE THIS SECTION ON DELIVERY* |
|---|---|

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

A. Signature

X ☐ Agent
☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery

1. Article Addressed to:

Sheriff Gary Borders
Lake County Sheriff's Office
360 West Ruby Street
Tavares, FL  32778-3826

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)*   ☐ Yes

2. Article Number
*(Transfer from service label)*

7003 1680 0000 2311 2387

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540